IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| SYDNEY F. POWERS, III, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:02-CV-0221 |
| | § | |
| JO ANNE BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION
TO REVERSE AND REMAND THE DECISION OF THE COMMISSIONER**

Plaintiff SYDNEY F. POWERS, III, brings this cause of action pursuant to 42 U.S.C. §

405(g), seeking review of a final decision of defendant JO ANNE B. BARNHART, Commissioner

of Social Security (Commissioner), denying plaintiff's application for disability benefits.  Both

parties have filed briefs in this cause.  For the reasons hereinafter expressed, the undersigned United

States Magistrate Judge recommends the Commissioner's decision finding plaintiff not disabled and

not entitled to benefits be REVERSED and REMANDED.

I.
PROCEEDINGS

Plaintiff applied for disability insurance benefits on December 15, 1997, alleging he became

unable to work because of a disabling condition on April 1, 1993.  (Tr. 68-70).  Plaintiff described

his disabling condition as "chronic severe pain lower back; down legs; numbness; muscle cramps;

muscle spasms; pain in joints; occasional numbness in hands."  (Tr. 77).  In describing how his

condition limits his ability to work, plaintiff stated, "Chronic severe pain with muscle cramping & spasms limits lifting, sitting, standing, walking for prolonged periods."  Plaintiff averred his condition first bothered him on January 18, 1991, rendering him unable to work two years later. Plaintiff noted he obtained his Bachelor of Business Administration in 1974, and identified past work as a supervisor/sales representative (1988-1991), an insurance agent (1981-1988), and a supervisor (1974-1981).  (Tr. 82; 83-88).  At the time he filed his application, plaintiff was 46-years-old.  (Tr. 68).

On February 2, 1998, the SSA, identifying plaintiff's primary diagnosis as "low back pain," denied plaintiff benefits determining plaintiff's condition, although it may cause some restrictions, does not prevent him from performing his previous job as an insurance agent as it is generally performed.[1]  (Tr. 50; 52-56).  Plaintiff requested the SSA reconsider its initial determination, explaining he did not agree with the determination because he "applied for insurance job.  Denied because of physical condition."  (Tr. 58).  On May 20, 1998, the SSA, again identifying plaintiff's primary diagnosis as "low back pain," denied plaintiff benefits upon reconsideration.  (Tr. 60-62).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), explaining he disagreed with the determination on reconsideration because "[i]nsurance co. will not employ me because of physical disability."  (Tr. 63).  On October 12, 1998, a representative was appointed to represent plaintiff in this proceeding.  (Tr. 33).  On August 5, 1999, the ALJ conducted an

---

[1]The SSA explained, "Doctor Berg told us that you have certain health problems that keep you from working.  Since your doctor's medical findings, your treatment history, or statements about your daily activities are not consistent with inability to work (as defined by Social Security guidelines), we cannot adopt your doctor's opinion in this determination.  We have determined that your condition is not severe enough to keep you from working.  We considered the medical and other information, your age, education, training and work experience in determining how your condition affects your ability to work.  You said you were disabled because of back problems.  This causes you some pain and discomfort.  However, your current symptoms are not severe enough to be considered disabling under Social Security guidelines.  Although you said you have back problems, the evidence does not show that your ability to perform basic work activities is as limited as you indicated.  Your overall medical condition may cause some restrictions.  However, your condition does not prevent you from performing your previous job as an insurance agent as it is generally performed."  (Tr. 56).

administrative hearing in this case.[2]  (Tr. 34-49).  On September 8, 1999, the ALJ rendered an

unfavorable decision, finding plaintiff was not disabled as defined by Title II, the Disability

Insurance Benefits Provisions of the Social Security Act, at any time through the date of the

decision.  (Tr. 17-31).

 In his decision, after reciting as facts the medical evidence of record, the ALJ identified the

issue to be determined as "whether a 48 year old man with status post fusion at L5/S1 and

degenerative disc disease is disabled within the meaning of the Social Security Act."  The ALJ then

determined plaintiff has the medically determinable impairments of (1) status post fusion at L5-S1,[3]

and (2) degenerative disc disease,[4] medical impairments that are "severe" within the meaning of the

Social Security Regulations.  (Tr. 22).  The ALJ further found plaintiff's impairments were not

severe enough to meet or medically equal one of the vertebrogenic impairments listed in Appendix

1, Subpart P, Regulations No. 4.  (Tr. 23).  The ALJ noted he specifically reviewed Section 1.05(C)

of the listings, but found the medical evidence did not contain the requisite findings to meet listing

1.05.

 In considering plaintiff's residual functional capacity (RFC), the ALJ found physical

examinations of plaintiff by treating physicians showed plaintiff was not in acute distress, and that

his systems were normal except for the fusion and degenerative disc disease.  The ALJ also noted

the findings of a non-treating physician, Dr. Tasker, that plaintiff could perform light work without

---

[2]In his request for an administrative hearing, plaintiff alleged he disagreed with the determination made on his claim because a letter from Farmers' Insurance Group reflected that the insurance company would not employ him because of his physical disability.  (Tr. 63).

[3]The lumbosacral joint – where the lumbar spine, the low back made up of five (5) vertebrae, meets the sacrum, the triangular bone located at the bottom of the spine.

[4]The gradual deterioration of the disc between the vertebrae, also referred to as spondylosis which can be seen on x-ray or MRI as a narrowing of the normal disc space between adjacent vertebrae.

significant limitations.  Based on the record as a whole, the ALJ adopted the findings of Dr. Tasker and found plaintiff had the RFC to perform the full range of light work.

The ALJ then weighed the evidence to determine if substantial evidence of a disability existed.  The ALJ noted the objective medical facts showed plaintiff's only impairments to be status post fusion at L5-S1 and degenerative disc disease.  (Tr. 24).  In reviewing the opinions and diagnosis of plaintiff's treating physician's, the ALJ found the *diagnoses* of plaintiff's treating physicians were consistent with the objective medical evidence.  The ALJ also noted SSR 96-6p required consideration of the opinions of state agency medical consultants as medical opinions of non-treating physicians and found the record as a whole supported the findings of Dr. Tasker.

The ALJ also noted SSR 96-5p describes policies applicable to cases where there is medical source opinion on issues reserved for the Commissioner, and that under 20 C.F.R. 404.1527(e) and 416.927(e) certain issues are not "medical issues" regarding the nature and severity of a claimant's impairment but, instead, are "administrative findings"dispositive of a case because they direct the determination or decision of disability.  (Tr. 25).  As examples of administrative findings reserved for the Commissioner, the ALJ referenced, as relevant here, opinions as to whether an individual's RFC prevents him from performing his past work or whether an individual is disabled under the Act.  The ALJ noted that as the regulations place the final responsibility for determining such issues on the Commissioner, a treating or medical source opinion on such issues, although not ignored, is <u>never</u> given controlling weight or special significance.  The ALJ explained that a treating opinion as to such issues would be evaluated along with all the evidence in the record to determine whether the medical source opinion that a claimant is disabled is supported by the record considered as a whole.

The ALJ noted the December 9, 1997 report of Dr. Berg, one of plaintiff's treating

physicians, that opined that plaintiff is disabled, unable to work, and should remain on long term disability.  The ALJ found, however, that the report by Dr. Tasker that plaintiff could perform light work was persuasive.

The ALJ then discussed plaintiff's subjective evidence of pain and disability, as well as plaintiff's age, education and work history as an insurance salesperson which was skilled, light work.  (Tr. 26).  The ALJ then analyzed plaintiff's subjective allegations of pain, noting it was within his discretion to determine the pain's disabling nature.  In considering whether plaintiff's impairments of status post fusion at L5-S1 and degenerative disc disease caused plaintiff disabling pain, the ALJ noted the objective medical evidence did not contain any indication of muscle atrophy, swelling, muscle spasm, prolonged bed rest, or premature aging.  (Tr. 27).  The ALJ noted the records revealed *some* limitation in range of motion, but no neurological dysfunctions or deteriorations, weight loss due to loss of appetite, or that plaintiff uses assistive devices to ambulate.  The ALJ found plaintiff could perform activities of daily living independently and appropriately, that the location of plaintiff's pain was in the low back, the duration was short, the frequency occasional, and the intensity mild, and that lifting medium to heavy weights precipitates plaintiff's pain.  The ALJ found plaintiff had no adverse side effect to his medication, and that his prescribed course of treatment was physical therapy and exercise.  (Tr. 28).  The ALJ again credited the report of Dr. Tasker as to plaintiff's ability to perform work-related activities and, based on Dr. Tasker's findings as well as the ALJ's finding that plaintiff's pain was mild and alleviated with medication and exercise, determined plaintiff's pain did not reduce his RFC below the full range of light work.  The ALJ then noted plaintiff's past work as an insurance salesperson was light, skilled work and, considering that he had the RFC for light work, plaintiff had the ability to perform this

past relevant work.  (Tr. 29).  The ALJ thus concluded plaintiff was not under a disability at any time through the date of his decision.  (Tr. 30-31).

Upon the Appeals Council's denial of plaintiff's request for review on February 22, 2002, the ALJ's determination that plaintiff is not under a disability became the final decision of the Commissioner.  (Tr. 11-12).  Plaintiff now seeks judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

II.
STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made.  *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).  To determine whether substantial evidence of disability exists, four elements of proof must be weighed: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94(5th Cir. 1972)).  If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding.  *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence.  *Hames v.*

*Heckler*, 707 F.2d at 164.  Stated differently, the level of review is not *de novo*.  The fact that the

ALJ <u>could</u> have found plaintiff to be disabled is not the issue.  The ALJ did not do this, and the case

comes to federal court with the issue being limited to whether there was substantial evidence to

support the ALJ decision.


III.

<u>ISSUE</u>

The ALJ made the determination that plaintiff is not disabled at Step Four of the five-step

sequential analysis.  Therefore, this Court is limited to reviewing only whether there was substantial

evidence in the record as a whole supporting a finding that plaintiff retained the ability to perform

his past relevant work, and whether the proper legal standards were applied in reaching this

decision.  To this extent, plaintiff presents the following issue:

> The ALJ erred by failing to give controlling weight to a treating physician's opinion
> when determining plaintiff's RFC; erring in giving greater weight to a non-treating
> physician's opinion over a treating physician's opinion when determining plaintiff's
> RFC; and erred in failing to set forth, in his decision, the reasons for the weight
> given to a treating physician's opinion and his analysis of various factors required by
> regulations to consider in assessing the weight of the treating physician's opinion.


IV.

<u>RECORD</u>

On January 18, 1991, plaintiff was involved in a motor vehicle accident while driving a

delivery truck for his employer.  X-rays on February 5, 1991 showed right sciatica,[5] possible

aggravation of an apparently old spondylolysis[6] of the L5-S1 area, some flattening of the femoral

---

[5]Pain along the large sciatic nerve that runs from the lower back down the back of each leg – a relatively common form of
low back pain and leg pain.

[6]A common clinical condition involving a defect in the thin isthmus of bone connecting the superior and inferior facets, most
commonly found at the L5 vertebra.

head[7] which appeared to be old leg Perthes disease, and a possible herniated disc[8] at L5-S1.  (Tr. 115).  Dr. Melburn K. Huebner referred plaintiff to physical therapy, and prescribed a corset and Naprosyn.[9]

Due to plaintiff's essentially normal physical examinations, Dr. Huebner continued conservative treatment of plaintiff from February 18, 1991 through March 25, 1991 for irritation of the right sciatic nerve and spondylolisthesis[10] seen on x-ray but which a bone scan revealed was apparently asymptomatic.  On April 3, 1991, a CT scan revealed plaintiff had a herniated disc in the right L5-S1 area pressing the nerve root, which would probably require discectomy,[11] and Grade I spondylolisthesis.  Plaintiff was referred to Dr. Charles Rimmer.  (Tr. 113-15).  In August 1991, Dr. Rimmer and Dr. Howard L. Berg performed a laminotomy[12] with excision of plaintiff's ruptured disc on the right side at the L5-S1 level.

Over a year later, on December 8, 1992, plaintiff presented to Dr. Berg with complaints of back pain with some spread to the right leg down to the thigh.  Examination of plaintiff was essentially normal and showed no motion at L5-S1, hardware in good position, no sign of any loosening or fracture, and a solid fusion.  The only suggested possible explanation for plaintiff's

---

[7]The 'ball' of the 'ball and socket' joint of the hip.

[8]As a disc degenerates, it can herniate (the inner core extrudes) back into the spinal canal, which is known as a disc herniation (or a herniated disc).

[9]A nonsteroidal anti-inflammatory drug used to relieve mild to moderate pain.

[10]Anterior slipping of the L5 vertebra over the sacrum most commonly caused by spondylolysis.

[11]Surgery involving the removal of part of the herniated disc, thus relieving pressure on the nerve tissue.

[12]The partial removal of the thin bony layer covering the spinal canal to allow viewing of an intervertebral disc.

continued pain was *mild* arachnoiditis,[13] but no such diagnosis was made.  Nonetheless, Dr. Berg opined plaintiff had a 25% permanent impairment of function and loss of physical function to the body as a whole as a result of his spine injury.  Dr. Berg opined plaintiff had reached maximum medical improvement, but could return to work with a standing limit of four (4) hours a day, a sitting limit of four (4) hours a day, and limited lifting of 25 pounds.  Plaintiff believed he could work with these restrictions if a job were available.  (Tr. 162).

Over a year later, on January 10, 1994, plaintiff presented to Dr. Berg requesting disability forms be filled out.  Plaintiff apprised Dr. Berg of what he believed his limitations were and Dr. Berg filled out the form that plaintiff could now stand for only 3 hours a day, sit for 3 hours a day, and lifting was limited to 15 pounds.  (Tr. 109; 161).

Six months later, on July 14, 1994, plaintiff again presented to Dr. Berg with complaints of the same level of back pain and requesting the physician again fill out long term disability papers for him as he was required to submit such forms every six months.  Plaintiff's physical exam and x-rays were, again, essentially normal.  Dr. Berg, identifying plaintiff's continued claims of pain as a "pain syndrome" and, based solely on the fact that plaintiff's complaints of pain were unchanged, opined that plaintiff remained at the same functional capacity level as stated on the previous evaluation.  Dr. Berg opined plaintiff was a Class IV with moderate limitation of functional activity, capable of only sedentary activities.  Dr. Berg opined that plaintiff was totally disabled from his regular occupation and that the only other occupation that would be possible would be one involving sedentary activities.  Plaintiff advised Dr. Berg that he did not believe he could do any sedentary work and that he wanted to be a Class V, severe limitation.  Dr. Berg acknowledged that

---

[13]A pain disorder caused by inflammation of the arachnoid lining (one of the three linings that surround the brain and spinal cord) which causes chronic pain of the low back.  Can be a rare complication of spinal surgery or trauma to the spine.

he thus filled out the form stating that plaintiff could not do any occupation based on plaintiff's statement that he could not do any occupation.  (Tr. 160).

Six months later, on February 7, 1995, plaintiff again presented to Dr. Berg for completion of the long-term disability claim.  Dr. Berg again filled out the form that plaintiff was a Class V with severe limitations in functional capacity and disabled from doing any occupation or his regular occupation.  Dr. Berg recommended over the counter medications for discomfort.  Plaintiff advised that he would return in one year for his insurance forms to be filled out again.  (Tr. 159).

On February 23, 1995, plaintiff presented to Dr. Rimmer having last been seen by the physician in August 1991, the time of plaintiff's surgery.  Plaintiff reported back pain with radiation into the right hip, and advised his symptoms worsened if he stood too long, coughed, sneezed or strained, and that he experienced numbness in his legs if he sat too long.  Physical examination was essentially normal, noting plaintiff could ambulate on his heels and toes without difficulty, although Dr. Rimmer noted plaintiff appeared to be in pain, shifting his position every few moments in order to be comfortable.  Dr. Rimmer noted a slight decrease in plaintiff's ability to extend the cervical spine,[14] that plaintiff could only list forward about 30 degrees, and listing backward beyond the horizontal caused pain almost immediately.  Dr. Rimmer's impression was that plaintiff appeared to have chronic pain and instructed a regimen of over-the-counter Ibuprofen.  On that same date, Dr. Rimmer reported, through correspondence, his findings to the insurance carrier apparently representing plaintiff's employer in a claim brought by plaintiff.  (Tr. 134-35).

On March 7, 1995, as noted in correspondence to the insurance carrier, plaintiff again presented to Dr. Rimmer with complaints of continued pain and was prescribed different

---

[14]Seven vertebrae beginning at the base of the skull.

medications.  (Tr. 132-33).  On March 9, 1995, x-rays ordered by Dr. Rimmer showed no evidence of instability of plaintiff's fusion at L5-S1 on flexion and extension views.  (Tr. 197).

On March 22, 1995, plaintiff presented to Dr. Rimmer, reporting continued pain with no improvement.  Studies were essentially normal and there was no evidence of movement at the L5-S1 level.  Dr. Rimmer observed plaintiff held himself stiffly, but was able to ambulate on his heels and toes without difficulty and upper extremity strength and reflexes were normal.  Dr. Rimmer referred plaintiff to Dr. Neil Veggeberg for physical therapy as reported to the insurance company by correspondence that same date.  (Tr. 130-31).

Dr. Veggeberg treated plaintiff from April 3, 1995 through July 17, 1995.  On April 3, 1995, plaintiff reported to Dr. Veggeberg that the fusion provided some mild relief in symptoms but that he "never reached the capability of being able to work" and, thus, applied to disability because he felt that "perhaps another course of therapy [would] help him improve his function."  Examination revealed good strength and range of motion in plaintiff's neck and shoulders, but a *marked* flattening of plaintiff's normal lumbar lordosis[15] in his lower back.  Plaintiff reported pain on extension and rotation to either side although straight leg raising was negative and no major neurological deficits were found.  Dr. Veggeberg opined plaintiff had as good of results from the fusion as would be expected as it had fused quite well, and recommended physical therapy to work on cervical and lumbar stabilization.  (Tr. 127).  On April 20, 1995, physical therapy advised plaintiff was making some progress and suggested plaintiff add pool therapy to his rehabilitation program.  Plaintiff had advised his physical therapists, however, that he was applying for Social Security and was not going to be returning to his original job.  (Tr. 125).  On May 1, 1995, Dr.

---

[15]The normal contour or curve of the neck and lower back.

Veggeberg, noting no major change in plaintiff's condition, emphasized plaintiff's need to continue with an aggressive exercise program and refilled a prescription for Vicodin.  (Tr. 124).  On May 15, 1995, plaintiff advised Dr. Veggeberg that he was "about the same" since his last examination, experiencing some numbness in his right hip to his toes.  Plaintiff had an increase in muscle tone in his back, but straight leg raising was negative and no major neurological deficits were noted.  Plaintiff reported "profound pain" when he extended and rotated to the right side.  Dr. Veggeberg opined plaintiff had only had mild improvement in his condition, and advised plaintiff to continue working with the exercises.  (Tr. 123).  Plaintiff reported he was "about the same" on July 17, 1995 and examination revealed a *slight* flattening of the normal lumbar lordosis and a slight increase in muscle tone in his abdominal region.  Plaintiff was instructed to exercise to stabilize his spine.  (Tr. 122).

On August 24, 1995, plaintiff returned to Dr. Berg with complaints of pain in the low back with some spread to the right thigh.  Dr. Berg noted plaintiff had not worked since he saw him last six (6) months prior.  Examination was essentially unchanged with appropriate straight leg raising, normal strength in the lower extremities, and good range of motion in his hips.  Dr. Berg advised plaintiff of options to alleviate his "chronic pain syndrome" but plaintiff stated "that he still thinks that he is completely disabled from doing any activities except regular activities of daily living because of his pain."  Dr. Berg again filled out the forms indicating plaintiff had a "Class V impairment with severe limitations and functional capacities and [was] disabled from doing any occupation or his regular occupation."  Dr. Berg also opined that plaintiff had a Class II nervous impairment.  Dr. Berg noted plaintiff only tried physical therapy for two weeks, as that was all that was approved, but opined that he was not a suitable candidate for rehabilitation as Dr. Berg had

already attempted such treatment.  Plaintiff was advised to continue with over-the-counter medications.  (Tr. 157-58).

On October 17, 1995, plaintiff returned to Dr. Veggeberg for an impairment rating.  After reciting his history with plaintiff, Dr. Veggeberg examined plaintiff finding good strength and range of motion (ROM) in plaintiff's neck and shoulders, 90 degrees of flexion at T12, with 45 degrees of this being sacral motion, and straight leg raising was negative to 90 degrees.  Dr. Veggeberg  found that although plaintiff exhibited a *profoundly* flat lumbar spine with "essentially zero degrees of extension of his back after testing with an inclinometer," he demonstrated no neurological deficits in his lower extremities.  Consequently, the ROM test was considered to be invalid.  Dr. Veggeberg opined that plaintiff had reached maximum medical improvement as there had been no major change in his condition for at least 60 days.  As a result of his examination, Dr. Veggeberg afforded plaintiff a "12 percent impairment for a segmental instability operation with residual symptoms." Dr. Veggeberg opined that plaintiff was capable of being employed, but should avoid working overhead, repetitive bending, and lifting greater than 30 pounds.  (Tr. 116-18; 119-20).

Plaintiff returned to Dr. Berg on February 6, 1996 for completion of another long-term disability form having last been seen six (6) months prior.  Plaintiff presented with complaints of continued pain, but examination was essentially normal.  Plaintiff reported taking Vicodin from Dr. Veggeberg on a fairly chronic basis and of his unsuccessful attempt to see Dr. Rimmer.  Plaintiff again refused re-exploration of the fusion and hardware removal as well as another non-surgical alternative.  Dr. Berg prescribed Darvocet[16] and again filled out another form indicating plaintiff had a Class II nervous impairment and a Class V physical impairment with severe limitations and

---

[16]A combination of acetaminophen (Tylenol) and propoxyphene designed to relieve mild to moderate pain.

functional capacities and was thus disabled from doing any occupation or his regular job.  (Tr. 155).

On April 22, 1996, Dr. Berg corresponded with the Texas Workers' Compensation Commission (TWCC) explaining plaintiff's main problem is one of "continuous pain with any position or sitting or any efforts at working or activities of daily living."  Dr. Berg noted plaintiff had not demonstrated any marked neurologic deficit or spinal instability and, thus, light work would not be a great risk for plaintiff.  Dr. Berg opined, however, that plaintiff would "complain bitterly of pain when returned to this level of work even though it is light duty work."  Dr. Berg acknowledged, however, that if plaintiff's pain could be "adequately controlled without the use of narcotics," then he would agree with Dr. Veggeberg that plaintiff could return to a light duty level of employment.  (Tr. 154).

Almost a year later, on February 10, 1997, Dr. Berg corresponded with plaintiff's attorney to explain that in previous long term disability claim forms he had completed for plaintiff, he had indicated that plaintiff was 75-100% physically impaired and that he could only perform sedentary activities.  Dr. Berg acknowledged his comment in his letter to the TWCC that if plaintiff's pain could be adequately controlled without the use of narcotics, that he would agree with Dr. Veggeberg that plaintiff could return to a light duty level of employment.  Dr. Berg advised that it was his understanding that plaintiff had continued to have significant pain with light activities and, thus, it was his opinion that plaintiff could not return to a light level of work as Dr. Veggeberg had indicated.  Dr. Berg advised that it was his opinion that plaintiff was still very physically impaired and could only perform sedentary activities and that he should remain on long term disability.  Dr. Berg further advised that he was very doubtful that plaintiff's pain would ever be adequately controlled without the use of narcotics for light duty activities or light duty level of employment.

(Tr. 153).

On April 3, 1997, plaintiff returned to Dr. Berg, having last been seen by the doctor over one year prior, and reported "some back pain after he is sitting in the WC Dispute Resolution Conference for about 2 hours."  Examination was essentially normal with regard to range of motion, straight leg raising, strength of the lower extremities, and reflexes.  Plaintiff reported he had not been taking any narcotics for pain relief, and refused other options for possible pain relief in the form of injection treatments or surgical removal of the hardware around the back fusion.  Dr. Berg filled out another form for plaintiff's insurance stating plaintiff was totally disabled, that plaintiff would probably remain on long term disability and would probably never return to work.  Plaintiff indicated frustration that his claim of long term disability was being questioned.  (Tr. 156).

Eight months later, on December 9, 1997, plaintiff again presented to Dr. Berg, reporting that he was still having significant pain, that he had not been able to return to work, and that he needed a letter to this effect.  Plaintiff reported he had not been able to do any activities of daily living or much around the house because of back pain.  Examination was essentially normal, and Dr. Berg opined that plaintiff's situation was essentially the same as it had been over the past years. Plaintiff advised he was not taking any narcotics.  In light of plaintiff's complaints of continued severe pain, Dr. Berg opined that plaintiff was totally disabled and would remain on long term disability and that it was doubtful that he would ever return to work in light of his pain syndrome. Petitioner was prescribed Neurontin,[17] with a follow-up prescription for Darvocet on March 24, 1998.  (Tr. 150).

On January 30, 1998, Dr. David Tasker, a non-treating physician, completed a Physical

---

[17]A medication for management of post-herpetic neuralgia.

Residual Functional Capacity Assessment for plaintiff at the request of the Administration.  Dr.

Tasker identified plaintiff's primary diagnosis as low back pain, and found plaintiff could

occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour

workday, sit about 6 hours in an 8-hour work day, and do an unlimited amount of pushing and/or

pulling.  Dr. Tasker explained his conclusions were based on medical records demonstrating that,

post-surgery, plaintiff's fusion at L5-S1 was solid, he could maintain straight leg raising (SLR) to

90 degrees, his hips had good range of motion, and other examination areas were normal.  Dr.

Tasker explained plaintiff had been seen only sporadically by Dr. Berg after recovery from his

surgery, approximately once a year, and that exams generally showed complaints of back pain,

*mildly* limited range of motion, SLR to 90 degrees, and no motor sensory or neurological deficits.

Dr. Tasker noted that for the past year, plaintiff had controlled his pain with non-narcotic

medications.  Dr. Tasker found plaintiff could frequently climb, balance, kneel and crawl, but could

only occasionally stoop and crouch.  Dr. Tasker found medical evidence of a back impairment, but

that the pain alleged appeared to be disproportionate to the medical findings and appeared to be

under control with non-narcotic medications.  Dr. Tasker explained Dr. Berg's records indicated

plaintiff was unable to perform even sedentary activities because of pain, but that his medical

findings did not substantiate this restriction.  Dr. Tasker noted Dr. Berg saw plaintiff only once or

twice a year, and had indicated his pleasure that plaintiff was not needing narcotics for his pain and

had prescribed him non-narcotic pain relievers.  On May 18, 1995, Dr. Moise D. Levy affirmed the

findings of Dr. Tasker.  (Tr. 163-68).

On April 22, 1998, approximately 4 ½ months since his last visit, plaintiff again presented to

Dr. Berg with complaints of "some additional pain about the low back."  Plaintiff advised he was

required by worker's comp to see Dr. Berg every three months and that he was still applying for social security disability for the third time.  Examination and x-rays were essentially normal.  Dr. Berg's impression was "[c]ontinued complaints of low back pain to the point the patient states he is having difficulty with activities of daily living and does not think he can work because of pain." Dr. Berg again found plaintiff's situation essentially unchanged, and again offered the option of surgical hardware removal.  Dr. Berg advised that, at the present time, in his opinion, plaintiff could not return to the previous work he was doing and remained totally disabled on long term disability. Dr. Berg noted the previous prescription for Darvocet was never filled and directed plaintiff to physical therapy twice a week for the next month.  Dr. Berg reiterated that as plaintiff was still having complaints of pain, in the doctor's opinion, plaintiff was totally disabled from his previous job and would remain on long term disability.  (Tr. 149).

On April 1, 1999, a year after his last examination of plaintiff, Dr. Berg completed a Residual Functional Capacity Questionnaire at the request of plaintiff's representative.  Dr. Berg indicated plaintiff could only sit, stand or walk for a total of one hour each in an 8-hour workday, and could only work for ½ hour.  He indicated plaintiff could occasionally lift or carry up to 10 pounds, and could never lift or carry heavier amounts due to his low back pain.  Dr. Berg found no restrictions for plaintiff's use of his hands or feet for repetitive actions.  He found plaintiff could never bend, squat, crawl, climb, reach above, stoop, crouch, or kneel because of his low back pain. Dr. Berg indicated plaintiff's pain level was severe (precluding activity precipitating the pain) and identified x-rays and muscle spasm as objective signs of plaintiff's pain.  Dr. Berg opined plaintiff's limitations were permanent and would prevent plaintiff from working an 8-hour day on a regular basis.  (Tr. 143-47).

V.

<u>MERITS</u>

Plaintiff contends the ALJ erred by failing to give controlling weight to the opinions of Dr.

Berg, one of plaintiff's treating physicians, when determining plaintiff's RFC, erred in attributing

greater weight to the opinion of Dr. Tasker, a non-treating physician, over the opinions of Dr. Berg

in determining plaintiff's RFC, and erred in failing to set forth, in his decision, the reasons for not

giving weight to Dr. Berg's opinion and in his analysis of various factors required by regulations to

be considered in assessing Dr. Berg's opinion.  Plaintiff cites *Newton v. Apfel*, 209 F.3d 448, 454

(5th Cir. 2000) for the general premise that the opinion of a treating physician should be accorded

*great weight* in determining disability.  Plaintiff then argues Dr. Berg's opinion as to the nature and

severity of plaintiff's impairment should have been given *controlling* weight because (1) Dr. Berg

was a treating physician, (2) his opinion was well-supported by medically acceptable clinical and

laboratory diagnostic techniques, and (3) such opinion was not inconsistent with other substantial

evidence.  Plaintiff notes SSR 96-2p instructs that if a treating source medical opinion is not well-

supported or is inconsistent, the opinion is not entitled to *controlling* weight but is not necessarily

rejected.  The treating source medical opinion is still entitled to deference and must be weighed

using the following factors:

1.      The physician's length of treatment of the claimant;

2.      The physician's frequency of examination;

3.      The nature and extent of the treatment relationship;

4.      The support of the physician's opinion afforded by the medical evidence of
        record;

5.      The consistency of the opinion with the record as a whole; and

6.     The specialization of the treating physician.

20 C.F.R. § 404.1527(d)(2).  Plaintiff further notes SSR 96-5p also requires an adjudicator weigh

medical source statements under the above factors and provide appropriate explanations for

accepting or rejecting such opinions.  Plaintiff also cites *Newton* as precedent requiring an ALJ to

consider each of the factors before declining to give any weight to the opinions of the claimant's

treating specialist.  Plaintiff contends the ALJ here should have given Dr. Berg's opinions greater

weight than the opinion of Dr. Tasker, and failed to consider each of the above factors before

declining to give any weight to Dr. Berg's opinions.

### *Weight of Treating Physician's Opinion and Consideration of Factors*

Plaintiff argues the ALJ failed to give sufficient weight to the opinions of Dr. Berg and

failed to consider the factors set forth in 20 C.F.R. 404.1527(d)(2) in his decision.  The ALJ

apparently gave little or no weight to Dr. Berg's opinions as to the degree of plaintiff's impairment

of physical function or limitation of functional activity caused by his diagnosed spinal condition

and his inability to work at his prior job or other jobs.

The ALJ failed to specifically and independently address, with detail, each of the factors set

forth in section 404.1527(d)(2) and failed to give specific reasons, other than implying that Dr.

Berg's opinions were opinions on issues reserved for the Commissioner, for not giving any weight

to Dr. Berg's opinions of disability.  Plaintiff argues that failing to specifically and independently

address each of the factors under section 404.1527(d) is reversible error.  The undersigned agrees.

This case turns upon whether plaintiff is able to perform the full range of light work, thereby

warranting a determination that he could return to his past relevant work as an insurance agent as

generally performed,[18] or whether plaintiff is restricted to sedentary work and, therefore, unable to return to his past relevant work.  While the ALJ's opinion contains an excellent analysis of pain (Tr. 26-27), ALJ does not cite any medical evidence of record to support his determination that plaintiff's pain is of short duration, occasional and of mild intensity.  The ALJ does not cite any source for this finding other than a statement that he adopted Dr. Tasker's findings that plaintiff's pain is mild and alleviated with medication and exercise (Tr. 28).  With no explanation or analysis as to why Dr. Berg's determination relative to plaintiff's pain, and for which he prescribed Darvocet, as well as Dr. Berg's other findings as to plaintiff's capabilities, the adoption of the findings of the non-examining physician, Dr. Tasker, was error.  It is also noted that as early as December 1992, Dr. Berg found plaintiff limited to 4 hours per day standing and 4 hours sitting.  Since light work requires standing or walking 6 hours per day, Dr. Berg's opinion, even at that early date, would eliminate a RFC for light work.

The failure adequately address and set out, pursuant to the applicable Social Security Regulations (20 CFR § 404.1527(d)(2)), an analysis of why the non-examining consultative physician's opinion (Dr. Tasker's) controls over the opinion of plaintiff's treating physician (Dr. Berg) of at least eight (8) years requires reversal and remand.  Upon remand, it may very well be determined that there are adequate reasons to reject the findings of Dr. Berg, plaintiff's treating physician.  However, it may also be, upon remand, that an analysis by the ALJ will result in a determination that there are not adequate reasons upon which to reject Dr. Berg's findings and opinion.  Consequently, remand is required.

---

[18]It is clear that plaintiff cannot return to his past relevant work for Farmer's Insurance Company.  The ALJ found that plaintiff's prior employer, Farmer's Insurance Company, would not hire him since their job description required an individual to perform work at a level higher than light work.

## VI.
## RECOMMENDATION

It is the recommendation of the undersigned United States Magistrate Judge to the United

States District Judge that the decision of the defendant Commissioner be REVERSED and

REMANDED.

## VII.
## INSTRUCTIONS FOR SERVICE

The District Clerk is directed to send a copy of this Report and Recommendation to

plaintiff's attorney of record and to the Assistant United States Attorney by the most efficient

means available.

IT IS SO RECOMMENDED.

ENTERED this <u>12th</u> day of September 2005.


_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE


## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation.  In the
event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is
eleven (11) days from the date of filing as indicated by the file mark on the first page of this
recommendation.  Service is complete upon mailing, Fed. R. Civ. P. 5(b), <u>and</u> the parties are
allowed a 3-day service by mail extension, Fed. R. Civ. P. 6(e).  Therefore, any objections must be
<u>filed</u> **on or before the fourteenth (14th) day after this recommendation is filed**.  *See* 28 U.S.C. §
636(b); Fed. R. Civ. P. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule
3.1, Local Rules of the United States District Courts for the Northern District of Texas.

Any such objections shall be made in a written pleading entitled "Objections to the Report
and Recommendation."  Objecting parties shall file the written objections with the United States
District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely

file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).